IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ANADRILL DIRECTIONAL | § | CASE NO.: 23-31199 |
| SERVICES, INC. | § | CHAPTER 7 |
| | § | |
| DEBTOR(S) | § | |
| | § | |
| RONALD J. SOMMERS, CHAPTER 7 | § | |
| TRUSTEE FOR ANADRILL | § | |
| DIRECTIONAL SERVICES, INC., | § | |
| | § | |
| | § | ADVERSARY PROCEEDING NO.: |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| GLOBAL MERCHANT CASH, INC., | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT**

Plaintiff, Ronald J. Sommers, Chapter 7 Trustee (hereinafter referred to as the "Plaintiff," or "Trustee") for Anadrill Directional Services, Inc. (the "Debtor"), complaining of Global Merchant Cash, Inc. (hereinafter referred to as "GMC" or "Defendant") hereby alleges and says as follows:

**PARTIES, JURISDICTION AND VENUE**

1.     The Debtor herein filed a voluntary petition under Chapter 7 on April 3, 2023 ("Petition Date"). Ronald J. Sommers is the duly appointed, qualified and acting Chapter 7 Trustee.

1

2.      Global Merchant Cash, Inc. is a corporation with a principal place of business located at 30 Broad Street, 14th Floor, New York, NY 10004.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

4.      This is a core proceeding under 28 U.S.C. § 157(b). The Trustee consents to the entry of final orders or judgment by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

5.      Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**GENERAL ALLEGATIONS**

6.      Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 5 inclusive, as if more fully set forth at length herein.

7.      This is an action to avoid the incurrence of an illegal, unenforceable usurious loan the Defendant made to the Debtor, to avoid and recover the transfer of property from the Debtor to the Defendant pursuant to §§ 548(a), and 550 of the Bankruptcy Code; and to recover treble damages and attorney's fees from Defendant under 18 U.S.C. § 1964(a) (RICO) for collection of an unlawful debt.

8.      Prior to the Petition Date, the Debtor provided oil and gas drilling services in Texas and the surrounding area. The company was led by Patrick McKinley, its President, CEO, and sole shareholder.

2

**THE AGREEMENT**

9.      On March 17, 2022, the Debtor—through Patrick McKinley—executed an "Agreement for the Purchase and Sale of Future Receipts" ("Agreement") with the Defendant that purported to sell $1,016,000.00 of future receipts of the Debtor in exchange for a payment of $650,145.18 to the Debtor. A copy of the Agreement is attached hereto as **Exhibit A**.

10.     According to the Agreement, Defendant was to be repaid each week in the amount of $21,166.67. The Agreement states that this amount represented 10% of the future revenue of the Debtor. Upon information and belief, this "Specified Percentage" of 10% is a figment and was artificially created by the Defendant. The Specified Percentage had no relation to the sales of the Debtor, rather, this figure was set by the Defendant so that it could speed up how quickly it was repaid.

11.     The repayment of $1,016,000.00 through payments of $21,166.67 results in 48 payments. Forty-eight (48) weeks equals 336 calendar days, or approximately 0.92055 years. A simple interest calculation yields an annual interest rate on the Agreement of approximately 61.13%.[1]

12.     According to the Agreement, the Defendant was authorized to file a UCC-1 Financing Statement that encumbered all assets of the Debtor—not just the amounts purportedly sold under the Agreement. Additionally, the Agreement was to be governed by New York law. Agreement. at p. 9, ¶ 29. Upon information and

---

[1] Interest Amount ($365,854.82—the difference between the $650,145.18 received and the $1,016,000.00 to be repaid) = Principal Amount ($650,145.18) x Rate of interest (here the variable to be calculated) x Time in years (0.92055).

belief, the Agreement was made in New York, and all payments were paid in the state of New York.

13.     Additionally, the Agreement created an irrevocable power of attorney in favor of Defendant "to take any action or execute any instrument or document to settle all obligations due to [GMC]." Id. at p. 3, ¶ 5. The Debtor and guarantor were to execute a confession of judgment in favor of the Defendant in the amount of $1,016,000.00. Id. at p. 12, ¶ 35. This confession of judgment would be filed in the event of a default by the Debtor. Moreover, the Debtor and guarantor were required to execute new confessions of judgment every three years after the first confession of judgment also in the amount of $1,016,000.00. Id. p. 13.

14.     The Agreement also provided a personal guarantee of Patrick McKinley for all amounts owed; and it allowed for the Defendant to debit the Debtor's bank account via ACH all amounts owed to it in the event of default. Id. at p. 7, ¶¶ 16.5, 16.8.

15.     According to the Agreement, if the Debtor ever defaulted on its obligations to Defendant, then the Purchased Percentage jumped from 10% percent of revenues to 100%, and all amounts would be drafted from the Debtor's bank account via ACH. This meant that Defendant would be diverting all daily sales amounts paid to the Debtor in the event of a default.

16.     On March 21, 2022, the Defendant wired $650,145.18 to the Debtor.

17.     Beginning on March 28, 2022, the Debtor made forty (40) installment payments to the Defendant in the amount of $21,166.67 each week. A total of

$846,666.80 was paid by the Debtor to the Defendant from the Debtor's Merrill (BOA) bank checking account ending in 9535 on account of the Agreement. The payments made by the Debtor on account of the Agreement are the "Transfers."

## INSOLVENCY

18.     At the time of the Transfer, the Debtor was insolvent. According to the Debtor's internal financial statements, in March 2022, the Debtor had negative equity (the Debtor's assets were exceeded by its liabilities). At the time of the Transfer, the Debtor could not meet its obligations.

19.     The Debtor's Chapter 7 schedules reflect assets totaling $2,442,210.91, and liabilities of $15,213,766.33. At all times between the Petition Date and March 17, 2022, the Debtor was insolvent.

20.     As part of the underwriting for the Agreement, the Debtor provided financial information to the Defendant. The Defendant knew, or should have known, of the insolvency of the Debtor at the time of the Agreement.

## FIRST CLAIM FOR RELIEF
(Avoidance of Constructively Fraudulent Obligation – 11 U.S.C. § 548(a)(1)(B))

21.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 20 inclusive, as if more fully set forth at length herein.

22.     The Agreement, while styled as a sale of receivables, was actually a loan to the Debtor.

23.     As the Defendant bore no risk of loss under the Agreement, the Agreement was actually a loan to the Debtor and not an outright sale of assets. See e.g., Nickey Gregory Co. v. Agricap, LLC, 597 F.3d 591 (4th Cir. 2010); See also,

Lange v. Inova Capital Funding, LLC (In re Qualia Clinical Service, Inc.), 652 F.3d 933 (8th Cir. 2011); Cap Call, LLC v. Foster (In re Shoot the Moon, LLC), 635 B.R. 797 (Bankr. Mont. 2021).

24.    By including in the Agreement, *inter alia*, a personal guarantee of the owner of the Debtor, a confession of judgment, a security interest in all assets of the Debtor (not just the alleged assets that were purportedly sold), an irrevocable and unconditional power-of-attorney in favor of Defendant, and the ability to sweep via ACH 100% of the Debtor's revenues, the Defendant did not bear any risk of loss under the Agreement—thus making it a loan under New York law.[2]

25.    Being a loan under New York law, the Agreement charged the Debtor an approximate annual rate of interest of 61.13%.

26.    Under New York law, the charging of interest in excess of 25.00% per annum is *criminally* usurious. N.Y. Penal Law § 190.40.

27.    The Agreement charged a rate of interest that is usurious and violates N.Y. Penal Law § 190.40.

28.    According to N.Y. Gen. Oblig. Law § 5-511[3] ("Usurious contracts void"), a contract that charges interest in excess of that prescribed by New York law is void.

---

[2] In a case with an agreement substantially similar to the one used by the Defendant (the issue of loan versus sale was not before the Court); a justice on the New York Court of Appeals indicated that such an agreement was a loan. See, Plymouth Venture Partners, II v. GTR Source, LLC, 37 N.Y.3d 591, 609 n. 2, 163 N.Y.S.3d 467, 183 N.E.3d 1185 (2021) ("The arrangements…appear less like factoring agreements and more like high interest loans that might trigger usury concerns.") (WILSON, J., dissenting).

[3] It should be noted that under N.Y. Gen. Oblig. Law § 5-521(1), the general rule is that corporations cannot "interpose the defense of usury in any action." However, Section 5-

29. The Agreement is void *ab initio* as it violated New York's criminal usury statute.

30. The incurrence of the Agreement did not provide reasonably equivalent value to the Debtor. The Agreement is illegal and unenforceable under New York law as it charged an annual interest rate in excess of 25%.

31. Illegal, unenforceable debts cannot provide reasonably equivalent value. See, Tabas v. Lehman (In re Capitol Invs., Inc.), 473 B.R. 838, 846 (Bankr. S.D. Fla. 2012) ("a transaction that is illegal under the laws of the State [ ] will not support 'value' for purposes of sections 548 or 550.").

32. Moreover, receiving $650,145.18 and agreeing to repay $1,016,000.00 over 336 days is not reasonably equivalent.

33. The incurrence of the Agreement should be avoided under Section 548(a)(1)(B) as it did not provide reasonably equivalent value to the Debtor.

34. This Court should declare that the incurrence of the Agreement should be avoided under 11 U.S.C. § 548(a)(1)(B) as Agreement did not provide reasonably equivalent value to the Debtor, is illegal, unenforceable, and void under N.Y. Gen. Oblig. Law § 5-511.

**SECOND CLAIM FOR RELIEF**
(Avoidance of Constructively Fraudulent Transfers – 11 U.S.C. § 548(a)(1)(B))

35. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 34 inclusive, as if more fully set forth at length herein.

---

521(1) has no application to loans that violate N.Y. Penal Law § 190.40. See, N.Y. Gen. Oblig. Law § 5-521(3). See also, Adar Bays, LLC v. GeneSYS ID, 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612 (2021).

7

36.     An unenforceable agreement cannot serve as an antecedent debt. The Bankruptcy Code defines a "debt" as "liability on a claim." 11 U.S.C. § 101(12). No liability can be established on an unenforceable claim; therefore, the Agreement cannot serve as an "antecedent debt" for the payment made by the Debtor.

37.     Additionally, with the Agreement being avoided under 11 U.S.C. § 548(a)(1)(B), the Debtor's payment on the avoided Agreement was made without receiving reasonably equivalent value. See e.g., Redmond v. Spiritbank (In re Brooke Corp.), 541 B.R. 492, 507 (Bankr. Kan. 2015) ("If the court avoids an obligation under section 548, transfers made by the debtor on account of that obligation are not made for reasonably equivalent value, and may be set aside as actually or constructively fraudulent.") (citation and quotation omitted). See also, Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest., Inc.), 337 B.R. 495, 502 (Bankr.S.D.N.Y.2006); and, Tabas v. Lehman (In re Capitol Invs., Inc.), 473 B.R. 838, 846 (Bankr. S.D. Fla. 2012) ("a transaction that is illegal under the laws of the State [ ] will not support 'value' for purposes of sections 548 or 550.").

38.     The Transfers were made within two (2) years of the petition date.

39.     The Transfers were a transfer of an interest of the Debtor in property.

40.     For the reasons alleged herein, the Debtor was insolvent on the date that the Transfers was made or became insolvent as a result of such transfers.

41.     At the time of the Transfers, the Debtor was engaged in business or a transaction, or was about to engage in business or transactions, for which any property remaining with the Debtor was an unreasonably small capital.

42.     At the time of the Transfers, the Debtor intended to incur, or believed that the Debtor would incur, debts that were beyond the Debtor's ability to pay as such debts matured.

43.     The payments totaling $846,666.80 made by the Debtor on account of the Agreement are avoidable as constructively fraudulent conveyances pursuant to 11 U.S.C. § 548(a)(1)(B); and the Plaintiff is entitled to avoid the Transfers for the benefit of the estate.

### THIRD CLAIM FOR RELIEF
(Recovery of Avoided Transfers – 11 U.S.C. § 550(a)(1))

44.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 43 inclusive, as if more fully set forth at length herein.

45.     Defendant received $846,666.80 in transfers avoidable under 11 U.S.C. § 548(a)(1). Defendant was the initial transferee of the avoidable transfers it received from the Debtor. The avoidable transfers made to Defendant was for the benefit of Defendant.

46.     Plaintiff seeks a judgment against Defendant in the amount of the avoidable transfers received by Defendant under 11 U.S.C. § 548, plus pre-judgment interest at the legal rate until judgment is entered.

### FOURTH CLAIM FOR RELIEF
(Violations of RICO – 18 U.S.C. §§ 1962(a), 1964(c))

47.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 46 inclusive, as if more fully set forth at length herein.

48.     18 U.S.C. § 1962(a) sets forth, in relevant part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, … through collection of an unlawful debt in which such person has participated as a principal … to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

49.    "Unlawful debt" under 18 U.S.C. § 1961(6) means a debt:

(A) … which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of … lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

50.    "Liability for an 'unlawful debt' RICO violation requires proof of five elements: [1] that a debt existed, [2] that it was unenforceable under New York's usury laws, [3] that it was incurred in connection with the business of lending money at more than twice the legal rate, [4] that the defendant aided collection of the debt in some manner, and [5] that the defendant acted knowingly, willfully and unlawfully." Haymount Urgent Care PC v. GoFund Advance, LLC, 609 F.Supp.3d 237, 246 (S.D.N.Y. 2022) (citing United States v. Biasucci, 786 F.2d 504, 513 (2d Cir. 1986)).

51.    Defendant has violated the "unlawful debt" provisions of RICO in that:

a.    the Agreement is void *ab initio* under New York law, the rate of interest exceeded 50% per annum (more than twice the legal rate of 25%);

b.    the Defendant aided collection of the usurious Agreement in that it drafted the payments for the usurious loan via ACH from the Debtor's bank account, and included several onerous default provisions to ensure repayment;

10

c.      the Defendant acted knowingly, willfully and unlawfully as it routinely makes these criminally usurious loans to other parties throughout the country;

d.      the Defendant attempts to conceal its usurious loans through nominally calling its agreements sales of "receipts" or "receivables."

e.      the Defendant used the proceeds from the usurious Agreement to invest in its operations that sought to issue more usurious loans to other businesses across the country.

52.     The remedies for violations of 18 U.S.C. § 1962(a) are treble damages, costs, and reasonable attorney fees. See, 18 U.S.C. § 1964(c).

53.     The Defendant provided $650,145.18 in loan proceeds to the Debtor. The Debtor repaid $846,666.80 to the Defendant on account of these usurious loans. The Debtor was injured in the amount of the difference between the amount it received and what it paid back—$196,521.62.

54.     Defendant is liable to the Plaintiff in the amount of $589,564.86 (three times the difference between the amount paid to Defendant than the amount loaned to the Debtor), plus: the costs of this action, pre-judgment interest, and reasonable attorney's fees for its violations of RICO.

WHEREFORE, Plaintiff prays that the Court grant the following relief:

A.      To avoid the Agreement as a constructively fraudulent obligation under 11 U.S.C. § 548(a)(1)(B);

11

B.      To avoid the constructively fraudulent transfers the Debtor made to the Defendant totaling $846,666.80 under 11 U.S.C. § 548(a)(1)(B);

C.      To enter judgment in favor of the Plaintiff against the Defendant under 11 U.S.C. § 550(a) in the amount of the avoided transfer Defendant received;

D.      To enter judgment in favor of the Plaintiff against the Defendant under 18 U.S.C. § 1964(c) in the amount of threefold the damages to be proven at trial, plus reasonable attorney fees;

E.      To award pre-judgment and post-judgment interest at the maximum legal rate until paid in full, with such recovery being for the benefit of the Debtor's estate;

F.      To tax the costs of this action against the Defendant; and,

G.      For such other and further relief the Court deems just and proper.

Respectfully submitted this 11th day of February, 2025.

RICHARD P. COOK, PLLC

/s/ Richard P. Cook
Richard P. Cook, admitted *pro hac vice*
N.C. State Bar No. 37614
7036 Wrightsville Ave, Suite 101
Wilmington, NC 28403
Telephone: (910) 399-3458
Email: Richard@CapeFearDebtRelief.com
*Special Counsel for Plaintiff*

12

# EXHIBIT A

Envelope ID: CCF93EA5-1083-467E-A38E-7ADE114A7816

# Agreement for the Purchase and Sale of Future Receipts

**Seller's Legal Name:** Anadrill Directional Services Inc          **D/B/A:** Anadrill Directional Services

**Form of Business Entity:** [x] Corporation; [ ] Limited Liability Company; [ ] Partnership; [ ] Limited Partnership; [ ] Limited Liability Partnership; [ ] Sole Proprietorship; [ ]Other: _____

**Street Address:** 11757 Katy Fwy                    , City: Houston          , State: TX      ; Zip: 77079

**Mailing Address:** 11757 Katy Fwy                    , City: Houston          , State: TX      ; Zip: 77079

**Primary Contact Name:** Patrick Jonathon Mckinley                              Title: _____

**Federal Tax ID Number:** 84-2213043

**Purchase Price:** $ 800,000.00      **Purchased Amount:** $ 1,016,000.00      **Average Monthly Sales:** $ 1,274,044.36

**Specified Percentage:** 10          % **Origination Fee:** $ 20,000.00    (to be deducted from the Purchase Price)

**Weekly Amount:** $ 21,166.67      (Average Monthly Sales x Specified Percentage / Average Business Days in a Calendar Month)

**Account for the Deposit of All Future Receipts:** Bank: Bank of America

Account No: ████ 9535                          Account No: _____

Account No: _____          Account No: _____

Effective,      03/17      , 20 22    Seller, identified above, hereby sells, assigns and transfers to Global Merchant Cash, Inc., located at 30 Broad Street – 14th Fl., New York, New York 10004 ("Buyer"), without recourse, the Specified Percentage of the proceeds of each future sale made by Seller (collectively "Future Receipts") until Seller has received the Purchased Amount. "Future Receipts" includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card") or other form of monetary payment in the ordinary course of Seller's business. As payment for the Purchased Amount, Buyer will deliver to Seller the Purchase Price, shown above, minus any Origination Fee shown above. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer.

Both parties agree that the obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to the Account and the ability to withdraw the Initial Weekly Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

—DS
*PM*

Initials: _____          1          207458v13

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes.

**FOR THE SELLER (#1)**

By: _Patrick Jonathon Mckinley_

(Print Name and Title)

*DocuSigned by:*

*Patrick Mckinley*

AE5FE5912D614EC...

(Signature)

**FOR THE SELLER (#2)**

By: _____

(Print Name and Title)

_____

(Signature)

**OWNER #1**

By: _Patrick Jonathon Mckinley_

(Print Name and Title)

*DocuSigned by:*

*Patrick Mckinley*

AE5FE5912D614EC...

(Signature)

**OWNER #2**

By: _____

(Print Name and Title)

_____

(Signature)

**GLOBAL MERCHANT CASH, INC.**

By: _____

(Company Officer)

Sales Associate Name _____

(Signature)

**Agreement of Each Owner:** Each Owner (each, a "Validity Guarantor") signing below agrees to the terms of the Credit Report Authorization below.

_Patrick Jonathon Mckinley_

(print name)

*DocuSigned by:*

*Patrick Mckinley*

AE5FE5912D614EC...

(Signature)

_____

(print name)

_____

(Signature)

1. **Delivery of Purchased Amount:** Seller must deposit all Future Receipts into the single business banking account specified above, which may not be used for any personal, family or household purposes (the "Account") and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into the Account. Seller agrees not to change the Account or add an additional Account without the express written consent of Buyer. Seller authorizes Buyer to debit the Weekly Amount (as such Weekly Amount is adjusted from time to time in accordance with Section 2 hereof) from the Account each business day by either ACH or electronic check. Seller will provide Buyer with all required access codes and agrees not to change them without prior written consent from Buyer. Seller will provide an appropriate ACH authorization to Buyer substantially in the form attached hereto as <u>Exhibit A</u>, provided that such form is acceptable to the Bank at which the Account is maintained. Seller understands that it is responsible for either ensuring that the Weekly Amount is available in the Account each business day or advising Buyer prior to each weekly withdrawal of a shortage of funds. Otherwise, Seller will be responsible for any fees incurred by Buyer resulting from a rejected electronic check or ACH debit attempt, as set forth on <u>Appendix A</u>. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement. Seller understands that the foregoing ACH

Initials: _PM_

2

DocuSign Envelope ID: CCF93EA5-1083-467E-A38E-7ADE114A7816

authorization is a fundamental condition to induce Buyer to accept the Agreement. Consequently, such authorization is intended to be irrevocable.

2. **Seller May Request Changes to the Weekly Amount:** The initial Weekly Amount is intended to represent the Specified Percentage of Seller's weekly Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Weekly Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. No more often than once a month, Buyer may adjust the Weekly Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Weekly Amount until any subsequent adjustment.

3. **Weekly Amount Upon Default.** Upon the occurrence of an Event of Default, the Weekly Amount shall equal 100% of all Future Receipts.

4. **Sale of Future Receipts (THIS IS NOT A LOAN):** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. If Future Receipts are remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to Buyer and would not be in breach of or default under this Agreement. Buyer is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein. Seller agrees that it will treat the Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. Seller agrees that Buyer is entitled to audit Seller's accounting records upon reasonable Notice in order to verify compliance. Seller waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Seller asserts that this transaction is anything other than a sale of future receipts.

5. **Power of Attorney.** Seller irrevocably appoints Buyer as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Buyer from Seller, or in the case of a violation by Seller of this Agreement or the occurrence of an Event of Default under Section 15 hereof by Seller, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Future Receipts; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors to direct payables to Buyer; (v) to file any claims or take any action or institute any proceeding which Buyer may deem necessary for the collection of any of the remaining Purchased Amount of the Future Receipts, or otherwise to enforce its rights with respect to delivery of the Purchased Amount; and/or (vi) to contact any Processor of Seller and to direct such Processor(s) to deliver directly to Buyer all or any portion of the amounts received by such Processor(s) and to provide any information regarding Seller requested by Buyer. Each Processor may rely on the previous sentence as written authorization of Seller to provide any information requested by Buyer. Each Processor is hereby irrevocably authorized and directed by Seller to follow any instruction of Buyer without inquiry as to Buyer's right or authority to give such instructions. Seller acknowledges the terms of the preceding sentence and agrees not to (a) interfere with Buyer's instructions or a Processor's compliance with this Agreement or (b) request any modification thereto without Buyer's prior written consent. The Seller also hereby grants to the Buyer full and complete power of attorney over the Account pursuant to which power the Buyer is authorized to withdraw all funds on deposit in such Account, to disburse such funds in the manner set forth herein, and to have access to all information, statements and reports pertaining to the Account, whether issued by the banking institution at which such account is maintained, the Internal Revenue Service, another governmental agency, or otherwise. This authorization may only be revoked with the prior written consent of the Buyer. The Seller hereby acknowledges and agrees that it shall be responsible for any debits that are bounced for any reason including, but not limited to, insufficient funds in the Account. Additionally, Seller shall be responsible for any monthly maintenance fees and any other fees due the bank as a result of maintaining the Account, including, but not limited to, Processor fees. Seller authorizes Buyer to maintain a $50.00 reserve (the "reserve") in the Account at all times, which reserve will initially be built up from the first several batches credited to the Account commencing during the Processing Trial. If at any time during the Agreement, the reserve drops below $50.00, Buyer is authorized to replenish the reserve out of the next credits to the Account in an amount of up to $50.00. In any instance where there are not enough funds

Initials: _PM_  3

in the reserve or the Account to cover fees or debits, Buyer shall have the right to withdraw these from Seller's Future Receipts that are thereafter deposited into the Account in order to satisfy the debits or fees and rebuild the reserve. Should there be no funds in the Account to cover the fees said fees will be added to the cash advance balance due Buyer.

6. **Fees and Charges:** Other than the Origination Fee, if any, set forth above, Buyer is NOT CHARGING ANY ORIGINATION OR BROKER FEES to Seller. If Seller is charged another such fee, it is not being charged by Buyer. A list of all fees and charges applicable under this Agreement is contained in Appendix A.

7. **Credit Report and Other Authorizations:** Seller and each of the Owners signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Owners continue to have any obligation owed to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

8. **Authorization to Contact Current and Prior Banks:** Seller hereby authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collections and in order to confirm that Seller is exclusively using the Account identified above, or any other account approved by Buyer, for the deposit of all business receipts.

9. **Financial Information**. Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will promptly provide to Buyer any authorizations, bank or financial statements, tax returns, etc., as Buyer deems necessary in its sole discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

10. **Transactional History**. Seller authorizes all of its banks and brokers and Payment Card processors to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon an Event of Default.

11. **Publicity**. Seller hereby authorizes Buyer to use its name in listings of clients and in advertising and marketing materials.

12. **Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

13. **Representations, Warranties and Covenants of Seller:**

    13.1. **Good Faith, Best Efforts and Due Diligence**. Seller will conduct its business in good faith and will use its best efforts to continue its business at least at its current level, to ensure that Buyer obtains the Purchased Amount.

    13.2. **Stacking Prohibited**. Seller shall not enter into any Seller cash advance or any loan agreement that relates to or involves its Future Receipts with any party other than Buyer for the duration of this Agreement without the express prior written consent of Buyer. Breach of this covenant will result in default, in which event Seller will be immediately be liable for the full balance owed to Buyer plus a default fee of $2,500 or 25% of the amount sold, whichever is greater. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

    13.3. **Financial Condition and Financial Information**. Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly represent the financial condition of Seller at such dates, and Seller will notify Buyer immediately if there are material adverse changes, financial or otherwise, in the

Initials: _PM_

4

condition or operation of Seller or any change in the ownership of Seller. Buyer may request statements at any time during the performance of this Agreement and the Seller shall provide them to Buyer within five business days. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations. Seller further agrees to authorize the release of any past or future tax returns to Seller.

13.4. **Governmental Approvals.** Seller is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

13.5. **Authority to Enter Into This Agreement**. Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

13.6. **Change of Name or Location or Sale or Closing of Business**. Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller agrees that until Buyer has received all of the Purchased Amount Seller will not voluntarily close its business on a temporarily basis for renovations, repairs, or any other purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer ten business days' notice to the extent practicable.

13.7. **Lease Effectiveness.**  Seller agrees that by signing this Agreement, it is agreeing to take all steps necessary to maintain in full force and effect and not terminate its lease, or vacate the current premises at the address listed in this Agreement before the Buyer is paid back in full.  If Seller intends to vacate, actually vacates or if landlord requires Seller to vacate before it has completed the payback to Buyer, then Seller and its principals shall provide Buyer with prompt notice thereof, and they shall be personally, jointly and severally liable for the outstanding balance.

13.8. **No Change of Control.**  Seller shall not undertake any transaction involving the sale, transfer or other conveyance of the Seller's business or its assets, either by an issuance, sale or transfer of ownership interests in the business that results in a change in ownership or voting control of the Seller's business, or by a sale or transfer of substantially all of the assets of the business without the express prior written consent of the Buyer;

13.9. **No Pending or Contemplated Bankruptcy.** As of the date Seller executes this Agreement, Seller is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney within six months prior to the date of this Agreement. Seller further warrants that it does not anticipate filing a bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

13.10. **Seller to Maintain Insurance.** Seller will possess and maintain insurance in such amounts and against such risks as are necessary to protect its business and will provide proof of such insurance to Buyer upon demand.

13.11. **Seller to Pay Taxes Promptly.** Seller will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes.

13.12. **Seller to Maintain Sufficient Funds on Deposit in the Account.**  The Seller shall maintain funds in the Account at all times in an amount that is sufficient to pay the Specified Percentage, any monthly maintenance fees and any other fees due the bank as a result of maintaining the Account, including, but not limited to, Processor fees, and the $50 reserve.

13.13. **No Violation of Prior Agreements.** Seller's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement the prohibits the sale or pledge of Seller's future receipts.

Initials: *PM*

5

DocuSign Envelope ID: CCF93EA5-1083-467E-A38E-7ADE114A7816

13.14. **No Diversion of Receipts; No Stop Payment.** Seller will not permit any event to occur that could cause a diversion of any of Seller's Future Receipts from the Account to any other entity, and Seller shall not attempt to place a Stop Payment on any debit by Buyer of the Specified Percentage or any other fees due to Buyer hereunder.

13.15. **No Payment Default.** Neither the Seller, nor any of its affiliates, is in default of any of its payment obligations under any agreement or instrument to the Buyer or any third party to which it is a party, nor is any third party attempting to collect funds from the Seller or any of its affiliates.

13.16. **Seller's Knowledge and Representation.** Seller represents warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

13.17. **No Fraud.** Seller shall not commit fraud.

14. **Rights of Buyer:**

14.1. **Financing Statements and Security Interest.** As security for Buyer's obligations hereunder, and under any other agreement between Buyer, on the one hand, and Seller or any affiliate of seller, on the other hand, Seller grants Buyer and/or its assignees or designees, if any, a continuing security interest, in the following property of the Seller: a security interest in all of (a) all of Seller's now owned and hereafter acquired accounts (including, without limitation, the Account), contract rights, chattel paper, tax refunds, documents, licenses, equipment, furniture, fixtures, general intangibles, instruments and inventory, wherever located, now or hereafter owned or acquired by the Seller; (b) all intellectual property including, without limitation, patents, trademarks and copyrights, trade names, service marks, logos and other sources of business identifiers (and applications for all of the foregoing), and all registrations, recordings and applications with the U.S. Patent and Trademark Office and all renewals, reissues and extensions thereof (collectively "Trademarks") whether now owned or hereafter acquired, together with any written agreements granting any right to use any Trademarks; and (c) all proceeds, as that term is defined in Article 9 of the Uniform Commercial Code ("UCC") (all such security interests, the "Collateral"). Wherever the term, "accounts receivable" appears herein, it shall have the same meaning as the term, "account", as defined under Section 9-101(a)(2) of Article 9 of the UCC. The security interest granted by Seller includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof, all proceeds of proceeds, and all records and data relating thereto. Seller authorizes Buyer to file one or more UCC-1 forms consistent with the Uniform Commercial Code ("UCC") in order to give notice of this security interest, to give notice that the Purchased Amount of Future Receipts is the sole property of Buyer, and to give notice of Buyer's security interest in the assets of Seller, and/or any affiliate of Seller, which arise out of any agreement entered into between any or all of them and Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

14.2. **Additional Collateral.** As further security to secure Validity Guarantor's payment and performance obligations to Buyer under the Guaranty, the Validity Guarantor hereby grants Buyer a security interest in _____ _____ (the "Additional Collateral"). Validity Guarantor understands that Buyer will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Merchant and Validity Guarantor each acknowledge and agree that any security interest granted to Buyer under any other agreement between Merchant or Validity Guarantor and Buyer (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.



Initials: _____

6

Merchant and Validity Guarantor each agrees to execute any documents or take any action in connection with this Agreement as Buyer deems necessary to perfect or maintain Buyer's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Validity Guarantor each hereby authorizes Buyer to file any financing statements deemed necessary by Buyer to perfect or maintain Buyer's security interest, which financing statement may contain notification that Merchant and/or Validity Guarantor have granted a negative pledge to Buyer with respect to Collateral and Additional Collateral, and that any subsequent lienor may be tortuously interfering the Buyer's rights.  Merchant and Validity Guarantor shall be liable for, and Buyer may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by Buyer in protecting, preserving and enforcing Buyer's security interest and rights.

14.3. **Negative Pledge.**  Merchant and Validity Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

14.4. **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's weekly receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, and (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer, and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

14.5. **Recording, and Solicitations; Monitoring.**

(i) <u>Authorization to Contact Seller by Phone; Monitoring.</u> Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions; and (ii) that such communications and contacts are not unsolicited or inconvenient.  Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.  Seller further agrees that any such call between Buyer and Seller, and their agents and employees may be recorded or monitored.

(ii) <u>Authorization to Contact Seller by Other Means.</u> Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

15. **Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default": (a) Seller interferes with Buyer's right to collect the Weekly Amount; (b) Seller violates any representation, warranty or covenant in this Agreement; (c) Seller uses multiple depository accounts other than the Account without the prior written consent of Buyer; (d) Seller changes its Account or its Processor without the prior written consent of Buyer; or (e) Seller fails to provide timely notice to Buyer such that in any given calendar month there are two or more ACH transactions attempted by Buyer are rejected by Seller's bank, or six or more ACH transactions attempted by Buyer are rejected by Seller's bank over any three month period.

16. **Remedies**. If any Event of Default occurs, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

16.1. The Specified Percentage shall equal 100%. The full uncollected Purchased Amount due under this Agreement will become due and payable in full immediately.

16.2. Buyer shall be entitled to recover from Seller all "Costs of Collection" which means any and all expenses and costs,

Initials: _PM_

7

DocuSign Envelope ID: CCF93EA5-1083-467E-A38E-7ADE114A7816

including attorneys' fees and court or arbitration costs, incurred by Buyer in connection with the defense, protection or enforcement of Buyer's rights under this Agreement (including, without limitation, in connection with any bankruptcy proceeding).

16.3.   Buyer may exercise any and all remedies available under Article 9 of the Uniform Commercial Code of any applicable jurisdiction as a secured creditor as it applies to the sale of accounts.

16.4.   Buyer may rescind this Agreement in its entirety, in which case Buyer shall be entitled to all remedies accorded to a party that successfully enforces a judicial rescission remedy.

16.5.   In addition to the foregoing, in the event of Seller's breach of any of the representations, warranties or covenants set forth in this Agreement, Seller agrees that Buyer shall be entitled to, but not limited to, damages equal to the amount by which the cash attributable to the Purchased Amount exceeds the amount of collections received by Buyer from Future Receipts.   The Seller hereby agrees that the Buyer may automatically debit such damages from Seller's depository accounts wherever situated, including the Account, via ACH debit or wire transfer.   Seller acknowledges that, in the event of a default by any Validity Guarantor, Validity Guarantors agree that Buyer may report such default to one or more credit bureaus.

16.6.   Buyer may enforce the provisions of the Validity Guaranty against each Validity Guarantor.

16.7.   Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

16.8.   Buyer may debit Seller's depository accounts wherever situated by means of ACH debit or email or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Buyer (including, without limitation, all Costs of Collection).

16.9. Buyer shall otherwise be entitled to all remedies available to it under law including, without limitation, the right to non-judicial foreclosure.

16.10. All rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

17. **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Buyer.

18. **Assignment by Buyer**. Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

19. **Notices**.

19.1. Notices from Buyer to Seller. Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective upon mailing to Seller's address set forth in this Agreement.

19.2. Notices from Seller to Buyer. Seller may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.

20. **Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of

Initials: _PM_

8

this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

21. **Interpretation.** All Parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

22. **No Waiver.** There shall be effected no waiver by failure on the part of Buyer to exercise, or delay in exercising, any right under this Agreement, nor shall any single or partial exercise by Buyer of any right under this Agreement preclude any other future exercise of any right, The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

23. **Entire Agreement and Severability.** This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

24. **Email or Facsimile Acceptance.** Email or facsimile signatures hereon, or other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes as if they were originally executed signatures.

25. **Confidentiality:** The terms and conditions of this Agreement are proprietary and confidential unless required by law. Seller shall not disclose this information to anyone other than its attorney, accountant or similar service provider and then only to the extent such person uses the information solely for purpose of advising Seller and first agrees in writing to be bound by the terms of this Section. A breach entitles Buyer to damages and legal fees as well as temporary restraining order and preliminary injunction without bond.

26. **Further Assurances.** Seller agrees that it shall, from time to time, promptly execute and deliver all instruments and documents, and take all further action, that may be necessary or appropriate, or that Buyer may request, to perfect against Seller and all third parties the sale of the Specified Percentage of Future Receipts hereunder or to enable Buyer to exercise and enforce its rights and remedies hereunder.

27. **Binding Effect; No Assignment by Seller.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion.

28. **Counterparts and Electronic Signatures.** This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile signatures or electronic signatures shall be deemed to be original signatures and each party hereto may rely on a facsimile signature or an electronic signature as an original for purposes of enforcing this Agreement. The words "execution," "signed," "signature," and words of like import in this Agreement and any amendments thereof shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

29. **Governing Law.** THIS AGREEMENT AND ALL TRANSACTIONS IT CONTEMPLATES, INCLUDING ALL ISSUES CONCERNING THE VALIDITY OF THE AGREEMENT AND ANY TRANSACTIONS IT CONTEMPLATES, THE CONSTRUCTION OF ITS TERMS, AND THE INTERPRETATION, PERFORMANCE AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES SHALL BE GOVERNED BY AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REQUIRE THE APPLICATION OF ANY OTHER LAW. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES AGREE THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THE ENTIRE RELATIONSHIP BETWEEN AND AMONG THE PARTIES, INCLUDING WITHOUT LIMITATION, ALL ISSUES OR CLAIMS ARISING OUT OF, RELATING TO, IN CONNECTION WITH, OR INCIDENT TO THIS AGREEMENT AND ANY TRANSACTIONS IT CONTEMPLATES, WHETHER SUCH CLAIMS ARE BASED IN TORT, CONTRACT, OR ARISE UNDER STATUTE OR IN EQUITY. AS USED HEREIN, THE PHRASE "LAWS OF THE STATE OF NEW YORK" INCLUDES NEW YORK LAW WITH RESPECT TO, AMONG OTHER THINGS, ANY APPLICABLE STATUTE OF LIMITATIONS, LACHES, OR SIMILAR TIME- BASED DEFENSE. THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT IS MADE AND PERFORMED IN THE STATE OF NEW YORK.

Initials: _PM_

9

DocuSign Envelope ID: CCF93EA5-1083-467E-A38E-7ADE114A7816

30. **Jurisdiction.** Seller and Validity Guarantor(s) further irrevocably and unconditionally consent and submit to the jurisdiction of any state or federal court sitting in the County of New York, State of New York, to resolve any suit, action, controversy, or proceeding of any kind (whether in contract, tort, statute, equity or otherwise) between or among the Parties, arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates. Seller and Validity Guarantor(s) hereby agree that any of the above-named courts shall be a convenient forum for any such suit, action, controversy, or proceeding of any kind between or among the Parties, arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates. Seller and Validity Guarantor(s) waive, to the fullest extent permitted by law, (i) any objection that Seller or Validity Guarantor(s) may now or later have to the laying of venue of any suit, action, controversy, or proceeding arising out of, relating to, in connection with, or incident to this Agreement or any of the transactions it contemplates in any of the above- named courts, (ii) any objection to personal jurisdiction applying in any such court, and (iii) any claim that any such suit, action, controversy or proceeding brought in any such court has been brought in an inconvenient forum. Seller and Validity Guarantor(s) agree that service of process in any such suit, action, controversy, or proceeding may be served on any of them by mailing or delivering a copy of the process to any of the addresses set forth in this Agreement or any other address Seller or Validity Guarantor(s) has provided to Buyer. Nothing set forth in this Section affects the right to serve process in any other manner permitted by law.

31. **Arbitration Agreement; Class Action Waiver.** This Arbitration Clause is an agreement between Seller, Validity Guarantors and Buyer to arbitrate disputes. "Disputes" is deemed to have the broadest possible meaning, and includes, without limitation, any and all disputes, claims or controversies, in law and in equity, between Seller and/or Validity Guarantors on the one hand, and Buyer on the other hand, arising out of or relating to this Agreement and/or (i) any claims of breach of contract, tort, misrepresentation, conversion, fraud, or unfair and deceptive trade practices, or (ii) any claim of a violation of any local, state or federal statute, regulation or ordinance, etc. At the request of either Seller and Validity Guarantor(s), on the one hand, or Buyer, on the other hand, any Dispute shall be settled exclusively and finally by arbitration conducted in the County of New York, State of New York under the commercial arbitration rules of the Commercial Panel of the American Arbitration Association (the "AAA"), such arbitration to apply the laws of the State of New York (without giving effect to conflict of laws principles). The Parties agree that, once any of them has elected to arbitrate, binding arbitration is the exclusive method for resolving any and all Disputes, and that, under this Arbitration Clause, all Parties are waving the right to a jury trial and the right to bring or participate in any class action in court or through arbitration (this is referred to below as the "Class Action Waiver"). Seller, Validity Guarantor(s) and Buyer hereby agree that the above-named forum shall be a convenient forum for any such arbitration proceeding or other controversy arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates. Seller, Validity Guarantor(s) and Buyer waive, to the fullest extent permitted by law, (i) any objection that they may now or later have to such laying of venue, (ii) any objection to personal jurisdiction applying in any such venue, and (iii) any claim that any such arbitration proceeding or other controversy brought in such venue has been brought in an inconvenient forum.

The arbitrator at such arbitration shall not be entitled to award punitive damages to any Party, and the costs and fees of such arbitration shall be borne by the losing Party. The Parties hereto acknowledge and agree that no class arbitration or other representative action may be undertaken or participating in by the arbitrators. The Parties shall jointly agree upon an AAA arbitrator or, if they cannot agree, the AAA shall select a neutral arbitrator from the AAA's Commercial Panel. The arbitration award shall be in writing, but without a supporting opinion unless such an opinion is requested by a Party.

Nothing in this Arbitration Clause shall be deemed to limit the right of Buyer (a) to exercise self-help remedies such as, without limitation, setoff, (b) to foreclose against any real or personal property collateral, or (c) to obtain from a court provisional or ancillary remedies such as, without limitation, injunctive relief, writ of possession or the appointment of a receiver. Buyer may exercise such self-help rights, foreclose upon such property, or obtain such provisional or ancillary remedies before, during or after the pendency of any arbitration proceeding brought pursuant to this Agreement. Neither this exercise of self-help remedies, nor the institution or maintenance of an action for foreclosure or provisional ancillary remedies, shall constitute a waiver of the right of any Party, including the claimant in any such action, to arbitrate the merits of the controversy or claim which prompted Buyer to resort to such remedies.

If a Party to this Agreement seeks to initiate arbitration, and another Party hereto refuses to arbitrate, the Party seeking to initiate arbitration may seek a court order enforcing this provision under which Buyer, Seller and Validity Guarantor(s) have agreed to arbitrate. In such event, the court shall determine any issues regarding the enforceability of this Arbitration Clause, including the validity and effect of the Class Action Waiver, but all other issues shall be decided by the arbitrator. If any Party fails to arbitrate as required under this Arbitration Clause, the Party electing arbitration shall, unless prohibited by applicable law, be entitled to recover its/their attorneys' fees and costs incurred in compelling the other Party to arbitrate the Dispute. All statutes

Initials: _PM_____                                    10

DocuSign Envelope ID: CCF93EA5-1083-467E-A38E-7ADE114A7816

of limitation that otherwise would apply to an action brought in court will apply in arbitration.

The Parties acknowledge and agree that the Federal Arbitration Act (9 U.S.C. § 1 et seq.) shall govern any arbitration under this Arbitration Clause.

If any part of this Arbitration Clause conflicts with the terms of any other document or agreement between the Parties or the rules of the AAA, the terms of this Arbitration Clause shall govern.  If any part of this Arbitration Clause other than the Class Action Waiver shall be deemed or found unenforceable for any reason, the remainder of the Arbitration Clause shall remain enforceable.  If the Class Action Waiver shall be deemed or found unenforceable for any reason, the remainder of the Arbitration Clause shall be unenforceable.

The Parties agree that the mutual promises in this Arbitration Clause constitute the consideration necessary to make this Arbitration Clause enforceable even if the Parties do not enter into any further agreements.  This Arbitration Clause shall survive the termination, rescission or payment in full of this Agreement.

Seller and the Validity Guarantor(s) may opt out of this Arbitration Clause by notifying Buyer in writing of their intent to do so.  Such election to opt out must be mailed by first class mail postmarked no later than ten (10) days from the date of this Agreement and addressed to Buyer at:

> GLOBAL MERCHANT CASH, INC.
> 30 Broad Street – 14th Fl.
> New York, New York 10004

If more than one Seller and/or Validity Guarantor is a Party to this Agreement, all such Sellers and Validity Guarantors must elect arbitration or elect to opt out in order for the arbitration election or the opt out election to be effective.

32. **LIMITATION OF LIABILITY.**  SELLER AGREES THAT, REGARDLESS OF ANY CLAIMS SELLER MAY HAVE AGAINST BUYER, SELLER'S SOLE REMEDY WILL BE AN ACTION AT LAW FOR ACTUAL MONEY DAMAGES THAT WILL NOT EXCEED THE GREATER OF (I) THE AMOUNT OF FUNDS OVERPAID TO BUYER OR (II) $1,000, AND THAT SELLER WILL NOT BE ENTITLED TO, AND HEREBY WAIVES ANY AND ALL CLAIMS FOR, PUNITIVE, EXEMPLARY, CONSEQUENTIAL, LOST PROFITS, STATUTORY, OR SPECIAL DAMAGES OF ANY KIND.  IF SELLER FILES AN ACTION AGAINST BUYER AND THE MATTER IS DISMISSED OR BUYER PREVAILS IN THE MATTER, SELLER AGREES TO PAY ALL OF BUYER'S ATTORNEYS' FEES AND COSTS INCURRED IN THE MATTER, WHETHER IN COURT OR ARBITRATION.

33. **SERVICE OF PROCESS.** IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE NEW YORK STATE CIVIL PRACTICE LAW & RULES ("CPLR"), SELLER HEREBY CONSENTS TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, SERVICE HEREUNDER SHALL BE COMPLETE UPON SELLER'S ACTUAL RECEIPT OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. SELLER MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS CAN BE MADE. SERVICE BY BUYER TO THE LAST KNOWN ADDRESS SHALL BE SUFFICIENT. SELLER WILL HAVE (30) CALENDAR DAYS AFTER SERVICE HEREUNDER IS COMPLETE IN WHICH TO RESPOND. FURTHERMORE, SELLER EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES.

34. **Indemnity.** Seller hereby indemnifies, defends and holds Buyer harmless from and against any and all direct and third-party suits, costs, causes of action, judgments, complaints, orders, and claims including, without limitation, reasonable attorneys' fees (each a "Claim") arising from or relating to any claim that Seller has breached this Agreement or that any representation, warranty, or statement Seller has made is not accurate in any respect.  Buyer shall notify Seller of any claim for indemnity hereunder, select counsel of Buyer's choice and Seller shall promptly pay all defense costs and satisfy any judgments. Buyer shall not settle any Claims that require Seller's payment of funds to any third party without Seller's approval, which approval shall not be unreasonably withheld or delayed.

Initials:  *PM*

11

DocuSign Envelope ID: CCF93EA5-1083-467E-A38E-7ADE114A7816

35. **Validity Guaranty; Confession of Judgment.** In consideration of the Buyer entering into this Agreement, and in order to induce the Buyer to enter into this Agreement, each of the undersigned Seller and principal(s) of Seller (such principals, whether officers, shareholders, partners, other owners or others are referred to herein as the "Validity Guarantors"), hereby personally assumes and, jointly and severally, guarantees, the truth, accuracy and completeness of all of the Seller's the representations, warranties and covenants set forth in this Agreement (collectively, the "Guaranteed Obligations"). In such instance, Validity Guarantors shall perform under this Agreement, including, without limitation, paying, or causing to be paid, any amounts that Buyer would otherwise be entitled to collect from Seller under the terms of this Agreement, immediately, upon notice from Buyer describing Seller's violation(s) of the representations, warranties and/or covenants set forth in this Agreement in summary form. Validity Guarantors' joint and several obligation to perform includes, without limitation, upon Seller's breach of any representation, warranty and/or covenant, Buyer's right to damages equal to the amount by which the cash attributable to the Purchased Amount exceeds the amount of collections received by Buyer from Receivables pursuant to Section 16 of the Agreement, without any presentment or demand made by the Buyer. In the event of a default by any Validity Guarantor, each Validity Guarantor agrees that Buyer may report such default to one or more credit bureaus. Each Validity Guarantor acknowledges that it will directly benefit from Buyer and Seller entering into the Purchase Agreement.

This Guaranty shall be a guarantee of performance of Seller's representations, warranties and covenants, and not a guarantee of collection. Validity Guarantors hereby waive demand of payment, notice and presentment, and agree that Buyer may proceed to enforce its rights against each Validity Guarantor or any other guarantor of Seller's obligations from time to time, prior to, contemporaneously with or after any enforcement against Seller, or without any enforcement against Seller. The obligations of Validity Guarantors are unconditional, absolute and irrevocable, and shall remain in full force and effect and without regard to, and shall not be released, discharged or in any way affected by, (a) any amendment to this Agreement; (b) any exercise or non-exercise of or delay in exercising any right, remedy, power or privilege under or in respect of this Agreement; (c) any bankruptcy, insolvency, arrangement, composition, assignment for the benefit of creditors, or similar proceeding commenced by or against the Seller or any of its officers, directors or principals; (d) defects in the formation or authority of Seller; or (e) any other circumstance that might otherwise constitute a legal or equitable discharge of a guarantor or surety. Validity Guarantors each further jointly and severally guarantee payment of all costs, expenses and attorneys' fees and disbursements which may be incurred by Buyer in connection with the Guaranteed Obligations, or any Validity Guarantor's default of its obligations under this Agreement. If payment of any sum by Seller is recovered as a preference of fraudulent conveyance under any bankruptcy or insolvency law, the liability of Validity Guarantors under this Guaranty shall continue and remain in full force and effect notwithstanding such recovery.

Each Validity Guarantor authorizes, acknowledges and agrees that, in connection with the execution of this Agreement, investigative and/or consumer reports may be obtained with respect to the Seller and Validity Guarantor(s). The reports Buyer obtains may include, but are not limited to, the Seller's or Validity Guarantors' respective credit histories or similar characteristics, employment and education verifications, social security verification, criminal and civil history, Department of Motor Vehicle records, any other public records, and any other information bearing on credit standing or credit capacity. Accordingly, each Validity Guarantor authorizes the Buyer, its agents and representatives and any credit reporting agency employed by the Buyer to investigate any references given or any other statements of data obtained from or about the Seller or any of its principals for the purpose of this Agreement and to obtain credit reports at any time now or in the future with respect to the Validity Guarantors. The Validity Guarantors to this Agreement are hereby notified that a negative credit report reflected on his/her credit record may be submitted to a credit reporting agency if the provisions of this Guaranty are triggered by a violation by the Seller.

In the Buyer's sole discretion, as security for the payments to be made hereinabove, the Seller and each of the Validity Guarantors shall duly execute and deliver to the Buyer an Affidavit of Confession of Judgment in form satisfactory to Buyer in the amount of $ 1,016,000.00, with interest at nine (9%) percent per annum, plus expenses, costs and attorneys' fees as specified therein. The Confession of Judgment shall be held by Buyer, and, if Seller breaches any of the representations, warranties and/or covenants given by Seller under the Agreement, Buyer, without notice to the Seller or the Validity Guarantors, is authorized to file the Confession of Judgment in the Court and to take the necessary steps to enter judgment against the Seller and the Validity Guarantors pursuant to the terms of the Confession of Judgment. The Seller and the Validity Guarantors each hereby waive and surrender any and all procedural and substantive rights or defenses, including, but not limited to, claims, counterclaims, setoffs, demands or discharges, to the entry of the Confession of Judgment, except with respect to establishing that a default did not occur or that notice was not given in accordance with the Agreement. Without limiting the generality of the foregoing, the Seller and the Validity Guarantors shall not assert, raise, plead or enforce against Buyer any defense of waiver, release, res judicata, statue of fraud, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to the Seller and the Validity Guarantors or any other person or entity liable in respect of any or all of the obligations under this

Initials: _PM_

12

DocuSign Envelope ID: CCF93EA5-1083-467E-A38E-7ADE114A7816

Agreement, or any setoff available against Buyer to the Validity Guarantors or any other such person, or entity whether or not on account of a related transaction.  Seller and Validity Guarantors shall also not assert, raise, plead or enforce against Buyer any time-based defenses, including, but not limited to, laches or any applicable statute of limitations, and Seller and Validity Guarantors hereby expressly waive any and all such defenses and hereby fully and expressly acknowledge the obligations and indebtedness stated herein.  Seller and Validity Guarantors further waive and relinquish any right to appeal from the entry of this Confession of Judgment.

The Seller and the Validity Guarantors shall cooperate and covenant not to oppose or contest the Buyer's docketing and entering the New York judgment in any court in New York, and/or in any other jurisdiction in which the Seller and/or any Validity Guarantor has assets.

Within thirty (30) days prior to the three-year anniversary of the date of the Affidavit of Confession of Judgment, the Seller and each Validity Guarantor shall each execute a new Affidavit of Confession of Judgment in the amount of $ 1,016,000.00 plus accrued interest and other charges and fees due hereunder and provide same to the Buyer, which shall be held pursuant to the terms hereof.  Upon the receipt of the new Affidavit of Confession of Judgment from the Seller and the Validity Guarantors by the Buyer, the Buyer shall return the earlier original Affidavit of Confession of Judgment within twenty (20) days.  The failure of Seller and each of the Validity Guarantors to provide such new Affidavit of Confession of Judgment shall be a breach of this Agreement and the Buyer shall be entitled to all its remedies provided hereunder.

Notwithstanding the foregoing, as long as the Seller and the Validity Guarantors are not in default under the Agreement, and timely renew their Confession of Judgment in accordance with the terms hereof, the Confession of Judgment shall not be entered or enforced.

Initials: _PM_    13

36. **Cross-Default.** Any default in any of the terms of this Agreement shall constitute a default in any of the terms of any other agreement between the parties hereto, and any default in any other agreement between the parties hereto shall constitute a default in this Agreement.

**FOR THE SELLER (#1)**

By: _Patrick Jonathon Mckinley_
      (Print Name and Title)

DocuSigned by:

_Patrick Mckinley_
AE5FE5912D614EC...
                                              (Signature)

**FOR THE SELLER (#2)**

By: _____
      (Print Name and Title)

_____
                                              (Signature)

**OWNER #1**

By: _Patrick Jonathon Mckinley_
      (Print Name and Title)

DocuSigned by:

_Patrick Mckinley_
AE5FE5912D614EC...
                                              (Signature)

**OWNER #2**

By: _____
      (Print Name and Title)

_____
                                              (Signature)

**VALIDITY GUARANTOR #1 (if any)**

By: _Patrick Jonathon Mckinley_
      (Print Name and Title)

DocuSigned by:

_Patrick Mckinley_
AE5FE5912D614EC...
                                              (Signature)

**VALIDITY GUARANTOR #2 (if any)**

By: _____
      (Print Name and Title)

_____
                                              (Signature)

**GLOBAL MERCHANT CASH, INC.**

By: _____
      (Company Officer)

Sales Associate Name _____
                                              (Signature)

DS
_PM_
Initials: _____

14

**Appendix A – List of Fees and Charges and Contact Information**

A.       In addition to the Purchased Amount of Future Receipts, the Agreement provides that the following fees shall be applied:

1.  **Non-Sufficient Funds (NSF) Fee - 35.00 each (Up to FOUR TIMES ONLY within any calendar month period before a default is declared, or SIX or more ACH transactions attempted by Buyer are rejected by Seller's bank over any three month period)**
2.  **Stop Payment Fee - $100.00**
3.  **Wire Fee -          $35.00**
4.  **UCC Filing Fee-      $295.00**
5.  **Default Fee -        $5,000.00**
6.  **Financing Fee:**
    a. $5,000    -   $9,999      = $_____
    b. $10,000   -   $19,999     = $_____
    c. $20,000   -   $49,999     = $_____
    d. $50,000   -   $100,000    = $_____
    e. $100,001  -   $249,999    = $_____
    f. $250,000  -   $399,999    = $_____
    g. $400,000  -   $699,999    = $_____
    h. $700,000  -   $1,000,000  = $_____
7.  **Other:**

B.       SELLER'S CONTACT

        Address          11757 Katy Fwy

                         Houston, TX 77079

        Phone (Land)     ████████

        Cell             _____

        Email Address    pmckinley@anadrill.net



Initials:

## EXHIBIT A

## AUTHORIZATION AGREEMENT
## FOR AUTOMATED CLEARING HOUSE TRANSACTIONS

[ Anadrill Directional Services Inc _____ ] ("Seller") hereby authorizes Buyer ("Buyer") to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other obligations due to Buyer from Seller under the terms of that Agreement for the Purchase and Sale of Future Receipts (the "Agreement") entered into between Seller and Buyer, as it may be amended, supplemented or replaced from time to time. In addition, if an Event of Default (as defined in the Agreement) occurs, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Agreement.  This Authorization Agreement is irrevocable without the prior written consent of Buyer.

Transfer Funds To/From:    Name of Bank: Bank of America _____

ABA Transit/Routing #: 111000025 _____

Checking Account #: ████████9535 _____

This authorization is to remain in full force and effect until all obligations due to Buyer under the Agreement have been fulfilled.

Seller Information:    Seller's Name: Anadrill Directional Services Inc _____

Signature of Authorized Representative: *Patrick Mckinley*
AE5FE5912D614EC...

Print Name: Patrick Jonathon Mckinley _____

Title: _____

Seller's Tax ID: 84-2213043 _____

Date: 03/17/2022 _____

## [Attached Voided Check Here]

Initials: PM

Dear Seller,

Please fill out the form below with the access information for your bank account, please write legibly and indicate lower/upper case sensitivity.

Legal Name/ DBA:  _Anadrill Directional Services Inc / Anadrill Directional Services_____

Bank portal website: _____

Username: _____

Password: _____

Security Question/Answer 1:_____

Security Question/Answer 2:_____

Security Question/Answer 3:_____

Security Question/Answer 4:_____

Security Question/Answer 5:_____

Security Question/Answer 6:_____

Any other information necessary to access your account: _____

Initials: _PM_

DocuSign Envelope ID: D2CF9E3A9-D9D-46E-A96E-FAEDEBD47216

# Global Merchant Cash

## ADDENDUM #1 TO THE PURCHASE AND SALE OF FUTURE RECEIVABLES AGREEMENT

This is an addendum to that Purchase and Sale of Future Receivables Agreement dated on the day of 03/17/2022   by and between, Global Merchant Cash, Inc. hereinafter referred to as "Purchaser," and  Anadrill Directional Services Inc          . (The "Business") and  Patrick Jonathon Mck (Owners), collectively hereinafter referred to as "Seller" (Purchase Agreement).

Now, therefore, in consideration of the premises and the mutual representations, covenants, undertakings, and agreemei hereinafter contained Seller and Buy represent, Covenant, undertake and agree as follows:

Seller and Purchaser agree to discount the amount of the purchased price according to the following schedule.

| Early Repurchase Date | Discount RTR Amount |
|---|---|
| Calendar Days 1-30 | $ 876,000.00 |
| Calendar Days 31-60 | $ 892,000.00 |
| Calendar Days 61-90 | $ 916,000.00 |

RTR Must be received either in the manor described in the agreement or via wire transfer to the Purchasers Bank Account and funds cleared prior to 12 AM on the above-mentioned  date.

Execution of this Addendum is made as of this 03/17/2022.

Purchaser:
By: Global Merchant Cash Inc
X._____

Seller:
By:  Patrick Jonathon Mckinley_____

DocuSigned by:

X  *Patrick Mckinley*_____
AE5FE5912D614EC...

1 of 1